UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:16-CR-195-MHC-1 |
| | ) | |
| JEFFREY WAYNE BROCK, | ) | |
| | ) | |
| Defendant | ) | |

**UNITED STATES' MEMORANDUM CONCERNING THE
SENTENCING OF DEFENDANT JEFFREY WAYNE BROCK**

The United States of America, by and through its undersigned attorneys,
respectfully submits this memorandum concerning the sentencing of the defendant,
Jeffrey Wayne Brock.  The Court is scheduled to sentence Brock on October 20,
2016.

On July 1, 2016, Brock pleaded guilty to his role in multi-year conspiracies
to rig bids and to commit bank fraud at 41 real estate foreclosure auctions in Cobb
County.  Brock and his conspirators cheated banks, homeowners, and other victims
out of more than $500,000 that otherwise would have been paid to them.  Pursuant
to a Plea Agreement, Brock and the United States will jointly recommend that the
Court calculate Brock's offense level as 15 (after accounting for a proposed

departure under U.S.S.G. § 5K1.1), which corresponds to a Guidelines range of 18 to 24 months of imprisonment and a $7,500 to $1 million fine.

The United States respectfully recommends that the Court impose a sentence that includes 15 months of imprisonment and a $75,000 fine (the "recommended sentence"). That sentence would reflect the seriousness of Brock's crimes and deter others from committing similar crimes in the future. A 15-month sentence would be the longest sentence imposed on any defendant who corrupted the foreclosure process in Georgia, but as explained more fully below, it would not create unwarranted disparities because Brock has caused more harm and is more culpable than any of the defendants who have been sentenced so far. Indeed, none of the factors that the Court must consider in fashioning an appropriate sentence under 18 U.S.C. § 3553(a) weigh in favor of a sentence shorter than 15 months.

## I.    Factual Background and the Defendant's Conduct

### A.    Overview of the Conspiracies

Jeffrey Brock is a 54-year-old United States citizen. In late 2001, shortly before he took a buyout and left a senior manager position at Federal Express, Brock began regularly attending real estate foreclosure auctions in Cobb County. Those open-outcry public auctions were held on the first Tuesday of each month, on the steps of the Cobb County courthouse in Marietta pursuant to Georgia's

statutory non-judicial foreclosure scheme.  *See* Ga. Code Ann. §§ 44-14-160 to -191 (2016).  The purpose of having a public auction is to generate the highest competitive market price for each of the foreclosed properties.  The proceeds from each public foreclosure auction are used to retire the mortgage debt and pay off any outstanding liens.  After paying off all of those debts, the homeowner receives any remaining sale proceeds, which represent the equity that he or she built up before defaulting on the mortgage.  Lenders and foreclosed homeowners, therefore, have direct and strong financial interests in foreclosure auctions generating the highest possible prices for their properties through a fair and competitive process.

Brock personally attended the Cobb County foreclosure auctions every month from late 2001 through the middle of 2010, and he continued to send his representatives to the Cobb County auctions after he stopped attending in person, until at least early 2012.  At first, Brock bought 1 or 2 foreclosed properties per month, rehabilitated them, and then resold them.  Brock formed Key Property Solutions, LLC in September 2002 and Last Stop Investments LLC in November 2003, and he used those companies to conduct some of his real estate business.  By 2008, Brock was buying as many as 3 to 4 foreclosed properties per month.

As a regular attendee at the Cobb County auctions, Brock got to know other regular bidders, including co-defendants David Wallace "Chuck" Doughty and

Stanley Ralph Sullivan.  Doughty and Sullivan were partners who had been jointly purchasing, rehabilitating and reselling foreclosed properties since at least the 1990s.  Between 2006 and 2012, Doughty and Sullivan purchased about 6 to 8 foreclosed properties per year.

Beginning at least as early as June 2007, and continuing until at least January 2012, Brock, Doughty, Sullivan, and others conspired to rig bids on properties being sold at the Cobb County foreclosure auctions.  To that end, the conspirators agreed not to bid competitively against each other at the public auctions for certain properties; designated which conspirator would bid on those properties at the public auctions and which conspirators would refrain from bidding; and refrained from or stopped bidding competitively for those properties at the public auctions.

After obtaining a property at a suppressed price, the conspirators then made payoffs among themselves to compensate one another for not bidding, and they also conducted "side" auctions open only to the conspirators, at which the conspirators would determine who would take title to the property and the amount of the payoffs to be made to the other conspirators.  The conspirators calculated the amounts of the payoffs based on the amounts that they were willing to pay for the properties had they bid competitively, as revealed in the bids that they actually

4

submitted in side auctions.  The more a conspirator was willing to pay, the bigger the payoff he would receive.

Brock, Doughty, Sullivan, and others participated in a scheme to obtain foreclosed properties from financial institutions at suppressed prices by, among other means, using materially false pretenses to convey the misimpression that they were bidding competitively at the public auctions and concealing the payoffs that they exchanged for not bidding against one another.  The bid-rigging and bank fraud conspiracies suppressed the sale price of the affected properties, causing financial losses to at least 37 victims, including lenders, homeowners, and others with interests in the properties.

## B.      Early Years of the Conspiracies

Between May 2007 and April 2008, Brock participated in side auctions for at least six properties, each of which involved seven or more other conspirators. For example, at the February 5, 2008 auction for a property on Serramonte Drive in Marietta, one of the conspirators won the public auction with a bid only $1 over the opening bid, *see* Ex. 1,[1] because ten other conspirators – including Brock and Doughty – agreed not to bid against him at the public auction.  The conspirators

_____

[1] Citations to "Ex. __" refer to exhibits contained within the United States' Sentencing Appendix, which has been submitted under seal.

then held a side auction for the property, where another conspirator agreed to pay

his ten co-conspirators a total of $60,315.54.  The amounts of the payments varied,

and the conspirators who submitted higher bids at the side auction received larger

payoffs.  Brock kept track of each conspirator's bid at the side auction and

calculated the payoffs due to each.  *See* Ex. 2, at KPS-DOJ-0456398.003 (showing

amounts "due to" each conspirator).[2]  Brock also collected a cashier's check for

$81,637.00 from the conspirator who won the side auction, *see* Ex. 3, kept

$5,093.38 as a payoff for himself, and wrote payoff checks to each of the other

conspirators from his personal checking account.  For example, Brock made a

$1,268.78 payoff to Doughty on March 3, 2008, and Doughty shared half of that

payoff ($634.00) with Sullivan on March 5, 2008.  *See* Exs. 4, 5.  If the

conspirators had bid on the property at the public auction in the same way that they

bid at the side auction, the money that Brock, Doughty, Sullivan, and the others

pocketed would have gone instead to a condominium association that had placed a

lien on the property and to the heirs of the homeowner whose death led to the

foreclosure in the first place.

---

[2] In addition to the page recording the bids at and calculating the payoffs for the
Serramonte Drive side auction, Exhibit 2 includes pages recording the same
information about two other side auctions.

In addition to the six side auctions involving large numbers of conspirators, Brock also participated in smaller side auctions. For instance, on June 5, 2007, Sullivan won the public auction for a property located on Hiawatha Lane in Austell with a high bid of $58,500.00, less than $300 over the opening bid. *See* Ex. 6. Sullivan, Brock, and two other conspirators conducted a side auction for the property, which Brock won. As the winner of the side auction, Brock took title to the property, and paid Sullivan $8,966.66 and the other conspirators a total of $10,533.32. *See* Ex. 7. The roughly $19,500.00 that Brock made in payoffs would have gone instead to the homeowner who lost her house to foreclosure, if Brock, Sullivan, and the other conspirators had bid competitively at the public auction.

Around April 2008, Brock stopped dealing with some of the conspirators because he came to believe that they were seeking only payoffs from side auctions, with no real intention to bid at the public auctions. Without Brock keeping track of their side-auction bids and calculating their payoffs, those conspirators were not able to continue rigging bids at the Cobb County foreclosure auctions, and the large side auctions (like Serramonte Drive) ceased. While Brock stopped dealing with some of the conspirators after April 2008, he continued to participate in smaller side auctions (like Hiawatha Lane) with Doughty, Sullivan, and others whom he knew remained ready and able to bid competitively against him.

7

### C.     Outside Investors Fuel Brock's Growth During the Great Recession

In 2009, the Great Recession[3] forced more Cobb County homes into foreclosure, and Brock formed a joint venture with a Florida company that could provide additional funding to expand his business. In exchange for acquiring, rehabilitating, and managing properties on behalf of his investor, Brock received both fees for his work and a share of any profits when the properties were resold. At the height of the venture, the investor had provided Brock with $8-10 million, allowing him to buy a total of 20 to 25 foreclosed properties per month in Cobb, Gwinnett, and DeKalb counties.

Despite this infusion of capital, Brock continued to participate in side auctions in Cobb County. As one example, on November 3, 2009, Brock bought a property located on Clairesbrook Lane in Acworth with a bid about $300 higher than the opening bid. Four other people – including Doughty – participated in a side auction where Brock agreed to pay them more than $9,000. Brock recorded the conspirators' bids from the side auction, sent his payoff calculations to them via email (which Doughty, in turn, forwarded to Sullivan), *see* Ex. 8, and paid

---

[3] According to the National Bureau of Economic Research, the Great Recession began in December 2007 and continued through June 2009, and "[e]conomic activity is typically below normal in the early stages of an expansion." *See* http://www.nber.org/cycles/sept2010.html.

$2,138.08 to Doughty (*see* Ex. 9) and nearly $4,000 more to two other co-conspirators.[4]  Brock made these payments using funds that he received from his investor, and he suggested that they "discuss how . . . to handle" situations like the "side bid we won on Clairesbrook . . . as they happen several times a year."  *See* Ex. 10, at KPS-DOJ-0451936.

With foreclosures continuing to mount in the Atlanta area in 2010, Brock recruited additional investors from Florida, Maryland, Arizona, and elsewhere to continue growing his business.  These investors collectively supplied millions of dollars in additional funding for Brock's purchases at real estate foreclosure auctions in Cobb County and twelve other metropolitan Atlanta counties.  An *Atlanta Business Chronicle* article from April 2011 named Key Property Solutions as one of the fastest growing privately held companies in Atlanta, and quoted Brock as explaining that his "rapid growth" was due in part to "an acceleration of market dynamics" – that is, the foreclosure crisis that was gripping the nation.  *See* Ex. 11, at 14B.

As Key Property Solutions grew, Brock no longer had the time to attend foreclosure auctions in person every month, so in June 2010, he hired a young man, whom he had known for years through his church, to attend the Cobb County

---

[4] Brock may not have made the promised payoff to his fourth co-conspirator.

auctions on his behalf.  Brock introduced that employee to Doughty, Sullivan and other conspirators and told him about side auctions.  Although Brock stopped going to the courthouse steps after that, he continued to participate in the bid-rigging and fraud conspiracies by directing his representatives' activities.

The events surrounding the December 6, 2011 foreclosure auctions illustrate how Brock used his representatives to perpetuate the Cobb County conspiracies even when he was no longer physically present.  On that day, Brock won the public auction for a property located on Heavenwood Drive in Mableton with a bid of $28,500.  Two days later, Doughty sent an email to one of Brock's employees (copying Brock and Sullivan), requesting a $1,400 payoff for Heavenwood Drive and additional payoffs of $1,400 and $3,770 for two other properties that Brock purchased at the same auction (John Street and Lakewood Drive, respectively). *See* Ex. 12, at KPS-DOJ-0422062-063.  When the employee disputed Doughty's payoff calculations – but not the existence of a bid-rigging agreement – Doughty explained that "Stan and I bid $29,900 on Heavenwood Drive" at the side auction and that "Stan and I talked on the phone prior to making our bid and we went over the math and both understood that our bid would leave us with $1400."  *See* Ex. 12, at KPS-DOJ-0422062.  Brock later reassured Doughty and Sullivan, writing, "You know we trust you guys," and attributing the dispute with his employee to

disorganization on a day when his business purchased 80 properties.  *See* Ex. 12, at

KPS-DOJ-0422062.  Less than a week later, Doughty and Sullivan received from

one of Brock's companies what they had requested:  a $2,800 check to Doughty for

Heavenwood Drive and John Street and a $3,770 check to Sullivan for Lakewood

Drive.  *See* Ex. 13.  Had the bidding been competitive at the public auctions, the

money that Doughty and Sullivan received from Brock would have gone to others

instead.  For instance, the Federal Housing Administration – the entity that insured

the mortgage on Heavenwood Drive – would have paid $1,400 less on the claim

made in connection with that foreclosure.

Brock did not use his own money to pay Doughty and Sullivan for not

bidding competitively at the December 6, 2011 auctions; rather, he used money

that outside investors had given him to acquire foreclosed properties.  To keep his

investors informed, Brock instructed an employee to send them invoices

documenting the payments that he made.  Brock's employee complied and, for

instance, sent to one investor invoices that Doughty prepared for the $1,400 payoff

on Heavenwood Drive and the $3,770 payoff on Lakewood Drive.  *See* Ex. 14, at

KPS-DOJ-0381977-978.  Although the invoices indicated that the payments were

"Finders Fee[s]," *see id.*, the employee explained to the investor that Brock

actually made the payments because he had "arrangements with other investors[5] to pay them . . . to not overspend on every property." *See* Ex. 14, at KPS-DOJ-0381974 (footnote added).  Similarly, a Key Property Solutions invoice to another investor described the $1,400 payoff to Doughty for 5891 John Street as part of a "[s]ide arrangement . . . wherein we paid him . . . to not bid up the property further." *See* Ex. 15.  When a Brock employee asked Doughty to prepare invoices that would be sent to yet another investor, he sought to assure Doughty that Brock would not report payoffs to the IRS, promising, "We ARE NOT going to 1099 you or your company." *See* Ex. 16, at KPS-DOJ-0425007.

In the end, Brock participated in the bid rigging and bank fraud conspiracies for more than four years.  During that time, he was involved in rigging bids for 41 properties and defrauding lenders, homeowners, and others with interests in those properties out of a total of $517,701.59.  Brock and his companies took title to 24 of the properties, valued collectively at $1,058,627.97, and he made payoffs totaling $119,961.73 to his conspirators on those properties.  PSR ¶¶ 21-22.  For

---

[5] In this context, "investors" refers to people like Doughty and Sullivan who attended the foreclosure auction and would otherwise bid against Brock, not to the companies that were supplying Brock with capital to purchase foreclosed properties.

the other 17 properties, Brock received a total of $91,839.62 in payoffs from his conspirators.  PSR ¶¶ 27-28.

## II.    The Parties Agree on Brock's Sentencing Guidelines Range.

Pursuant to a Plea Agreement, on July 1, 2016, Brock pleaded guilty to one count of bid rigging, in violation of 15 U.S.C. § 1, and one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349.  In paragraphs 9 and 10 of the Plea Agreement, Brock and the United States agreed to jointly recommend that the Court find that Brock's offense level is 15 (after making adjustments under U.S.S.G. § 3E1.1[6] and U.S.S.G. § 5K1.1[7]) and that his Guidelines' imprisonment range is 18 to 24 months.

## III.   The Section 3553(a) Factors Weigh in Favor of the Recommended Sentence.

Brock's Guidelines range of 18 to 24 months of imprisonment "should be the starting point and the initial benchmark" in fashioning his ultimate sentence. *See Gall v. United States*, 552 U.S. 38, 49 (2007).  In addition to the Sentencing

---

[6] Pursuant to U.S.S.G. § 3E1.1(b), the United States hereby moves that the Court grant a 3-level decrease in Brock's offense level from 21 to 18 because he has assisted authorities in the prosecution of his own misconduct by timely notifying them of his intention to enter a plea of guilty.  *See* PSR ¶¶ 69-72.

[7] The United States has submitted a separate motion requesting that the Court make a downward departure pursuant to U.S.S.G. § 5K1.1 due to the substantial assistance that Brock has provided the United States' investigation since deciding to plead guilty.

Guidelines, the Court also must consider the other factors enumerated in 18 U.S.C. § 3553(a).  All of those factors support the United States' recommended sentence of 15 months.[8]

### A.   The Nature and Circumstances of Brock's Offense Require a Significant Prison Sentence.

Section 3553(a)(1) directs a sentencing court to consider "the nature and circumstances of the offense."  As set forth above, Brock agreed to rig bids with competing bidders on 41 real estate foreclosure auctions over the span of more than four years.  On more than half of these properties (24 of 41 properties), Brock took title and paid his conspirators a total of $119,961.73 for not bidding against him at the public auctions.  *See* PSR ¶¶ 21-22.  For the 17 remaining properties, other conspirators took title and paid Brock for not bidding against them.  All told, Brock and his conspirators defrauded banks, homeowners, and other victims out of $517,701.59, and Brock himself received $91,839.62 of that total.  *See* PSR ¶¶ 27-28.  For the homeowner victims, these thefts occurred at a low point in their lives,

---

[8] The factors identified in § 3553(a)(1), (2), (5), and (6) are discussed at greater length below, and the application of the Sentencing Guidelines (*see* § 3553(a)(4)) was addressed above.  Section 3553(a)(3) requires the Court to consider the kinds of sentences available, but that factor does not weigh in favor of or against any particular sentence for Brock.  Section 3553(a)(7) also requires the Court to consider the need to provide restitution to victims, and Brock has agreed to pay $91,839.62 in restitution.  *See* PSR ¶¶ 6, 51-52.

when they had lost their homes to foreclosure.  The money that Brock and his

conspirators kept for themselves could have helped the victims get back on their

feet, but Brock instead enriched himself.  Like other white-collar criminals, Brock

also sought to conceal his conduct by asking Doughty and Sullivan to provide

invoices falsely claiming that payoffs were "Finders Fee[s]" and promising not to

report the payments to the IRS on Form 1099s.  *See* Ex. 14, at KPS-DOJ-0381977-

978; Ex. 16, at KPS-DOJ-0425007.  Nothing about Brock's offenses suggests that

the recommended sentence would be too high.  *Cf. United States v. Vandebrake*,

771 F. Supp. 2d 961, 999-1005 (N.D. Iowa 2011) (emphasizing the need for strong

sentence in a bid-rigging case where defendant "effectively robbed several local

governments of monies that could have been used for the betterment of their

communities").

 To the contrary, Brock's special role – unique not only among the

conspirators in Cobb County, but also among all of the other individuals previously

sentenced in this district – makes him especially culpable and deserving of a 15-

month sentence.  In 2007 and 2008, Brock essentially functioned as the

bookkeeper for his co-conspirators by (a) coordinating large side auctions

involving as many as 10 others, (b) collecting and recording all of the bids, (c)

creating spreadsheets to calculate the payoffs owed to each conspirator, (d)

informing the others how much they were owed; and (e) making the payoffs. Brock wrote payoff checks even for properties that he did not win (as with Serramonte Drive).  *See* Ex. 2, at KPS-DOJ-0456398.0003; Ex. 4.  Brock's indispensable role in the conspiracy is illustrated by the fact that, once he decided not to deal with some of the conspirators any more, those conspirators stopped rigging bids and the large side auctions fell apart.  In other words, Brock uniquely had the power to end the participation of his co-conspirators and exercised it only incompletely when he felt that he was making unnecessary payoffs to them.

Even after the large side auctions ceased, Brock continued to demonstrate his unique commitment to the conspiracies.  Unlike any of his conspirators, Brock solicited outside investments from companies throughout the United States, hired dozens of employees, and purchased 20 properties per month in Cobb County (PSR ¶ 39), roughly three times the number of properties that other conspirators (such as Doughty and Sullivan) purchased in an entire year.  Even after other business kept him physically away from the Cobb County foreclosure auctions, Brock directed his employee to keep the conspiracy alive on his behalf.

## B.    Brock's History and Characteristics Should Not Excuse His Offenses.

In addition to the nature of the offense, Section 3553(a)(1) requires consideration of "the history and characteristics of the defendant."  Brock is 54

years old and in good health, PSR ¶¶ 82, 90, capable of serving the recommended

sentence.  His lack of serious criminal history does not merit a sentence any further

outside the Sentencing Guidelines range because the Guidelines already account

for his relatively clean record by assigning him to criminal history category I.  *See*

PSR ¶ 76; *see also United States v. Martin*, 455 F.3d 1227, 1239 (11th Cir. 2006)

(noting that defendant's "criminal history category of I already takes into account

his lack of a criminal record").

Brock has signaled that he will request a non-incarcerative sentence because

he would have to lay off 42 employees if he were imprisoned (PSR ¶ 49),

essentially asking the Court to find that he is too big to jail.  But "[o]wnership of a

business . . . is irrelevant for sentencing purposes."  *United States v. Mogel*, 956

F.2d 1555, 1564 (11th Cir. 1992).  And Brock's argument would lead to perverse

results.  Under his logic, if the owner of one company and a low-level employee

both participated in a conspiracy to rig bids with the company's competitors, the

owner should escape jail time, while the employee could be held fully accountable.

Or in the context of this case, Brock implies that he should receive a more lenient

punishment than Doughty or Sullivan because he is successful enough to have

employees, while they are not.  Brock alone put his employees' jobs at risk.  He

participated in bid rigging and fraud conspiracies, and he subsequently failed to

prepare for his possible incarceration while he was being investigated.  Neither

Brock's status as an employer nor any of his other characteristics warrant less than

the recommended sentence.

**C.    Only a Significant Prison Sentence Will Reflect the Seriousness of Brock's Offenses and Deter Others from Committing Similar Crimes.**

Section 3553(a)(2) instructs that a sentencing court should consider the need

for a sentence "to reflect the seriousness of the offense, to promote respect for the

law, and to provide just punishment for the offense" and "to afford adequate

deterrence to criminal conduct."[9]  As explained above, for more than four years,

Brock conspired to rig bids and defraud dozens of victims (including homeowners

who had lost their houses to foreclosure) out of more than half a million dollars.

These serious offenses deserve a serious sentence.  Any sentence that does not

include a significant period of incarceration would not reflect the seriousness of the

---

[9] Section 3553(a)(2) also requires consideration of how the sentence will "protect the public from further crimes of the defendant" and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  These factors should not play much of a role in fashioning Brock's sentence because a sentence that adequately deters criminal conduct (as discussed in text) also will adequately protect the public from the possibility that Brock will commit further crimes upon release and because Brock does not need any services.

offense; such a sentence would signal to the public and other potential offenders that white-collar criminals will be allowed to profit at others' expense.

The recommended sentence will deter others from committing antitrust and fraud offenses.  The Eleventh Circuit has emphasized that "Congress viewed deterrence as particularly important in the area of white collar crime."  *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks omitted).  "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.  Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment."  *Id.* (internal quotation marks, alteration, and citation omitted); *see also United States v. Livesay*, 587 F.3d 1274, 1279 (11th Cir. 2009) ("It is difficult to imagine a would-be white-collar criminal being deterred from stealing millions of dollars . . . by the threat of a purely probationary sentence.").  Brock's sentence must be severe enough to provide adequate deterrence – not only specific to him, but also generally to others from corrupting the foreclosure auction process and enriching themselves through similar crimes.  The recommended sentence would accomplish these objectives.

**D.    The Sentencing Commission's Policy Statements Support the Recommended Sentence.**

Section 3553(a)(5) directs sentencing courts to consider "any pertinent policy statement . . . issued by the Sentencing Commission," and the Commission has concluded that defendants like Brock should receive jail time.  Criticizing some past sentences, the Commission determined that, "[u]nder pre-guidelines sentencing practice, courts sentenced to probation an inappropriately high percentage of offenders guilty of certain economic crimes, such as theft, . . . antitrust offenses, [and] fraud, . . . that in the Commission's view are 'serious'" and explained that only "the definite prospect of prison . . . will serve as a significant deterrent."  U.S.S.G. Ch.1, Pt. A, introductory cmt. 4(d).  In particular, the Commission urged that antitrust offenders should serve prison time:

> Under the guidelines, prison terms for these offenders should be much more common, and usually somewhat longer, than typical under pre-guidelines practice.  Absent adjustments, the guidelines require some period of confinement in the great majority of cases that are prosecuted, including all bid-rigging cases.  The court will have the discretion to impose considerably longer sentences within the guideline ranges.

U.S.S.G. § 2R1.1 cmt. background.  Commentary Note Five to U.S.S.G. §2R1.1 also emphasizes that "[i]t is the intent of the commission that alternatives such as community confinement not be used to avoid imprisonment of antitrust offenders."  Courts have recognized and applied these Sentencing Commission policies in other

criminal antitrust cases,[10] and they weigh heavily against a non-custodial sentence for Brock here.

### E.   The Recommended Sentence Would Not Create Unwarranted Disparities.

Section 3553(a)(6) directs sentencing courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  As of the time of this submission, 13 individuals have pled guilty to antitrust and fraud offenses in connection with real estate foreclosure auctions and been sentenced in the Northern District of Georgia, and 5 others (including Brock, Doughty, and Sullivan) will be sentenced soon.  *See* Ex. 17 (summarizing sentences imposed on previously sentenced defendants).

Although the recommended sentence is longer than prior sentences, it would not create an unwarranted disparity.  The Guidelines use offense levels to compare defendants' relative levels of culpability, and most of the previously sentenced defendants had offense levels of 12 or lower, far below Brock's offense level of

---

[10] *See, e.g.*, *United States v. Rattoballi*, 452 F.3d 127, 135 (2d Cir. 2006) ("The Guidelines reflect a considered determination by the Commission that jail terms are the most effective deterrent for antitrust violations."); *United States v. Haversat*, 22 F.3d 790, 797 (8th Cir. 1994) ("The Sentencing Commission has emphasized that the sentencing court should impose some *confinement* in all but the rarest criminal antitrust cases.").

15.  Because they were significantly less culpable than Brock, the recommend

sentence would not create an *unwarranted* disparity with their sentences.

Only four defendants (Eric Hulsman, Christopher Anderson, David Wedean,

and Morris Podber) had offense levels comparable to Brock,[11] and Brock caused

greater harm than any of them.  As reflected in their relative fraud loss amounts,

Brock defrauded his victims out of 9%, 78%, 84%, and 101% more money than

Hulsman, Anderson, Wedean, and Podber, respectively.  Put another way, Brock's

conduct caused twice as much financial loss as Podber's conduct, and Podber

received 10 months in prison.

In addition, several factors unique to Brock further distinguish his conduct

from the conduct of Hulsman, Anderson, Wedean, or Podber.  First, Brock

coordinated the large side auctions and payoffs that took place in Cobb County in

2007 and 2008; no other defendant has engaged in similar conduct.  Second, Brock

alone recruited outside investors from around the country and purchased far more

foreclosed properties than any other defendant.  Third, Brock took unique steps to

conceal his illegal conduct, directing the preparation of fraudulent invoices to mask

illicit payoffs and assuring his co-conspirators that he would conceal the payoffs

---

[11] Anderson will be sentenced the day before Brock, and the United States will
advise the Court at the sentencing hearing of the sentence that Anderson receives.

from tax scrutiny.  Finally, while other defendants acted on their own account, Brock hired and directed employees to perpetuate the conspiracies in Cobb County after he became too busy to attend the auctions in person.  These facts further bolster what the fraud-loss figures show:  it is not the United States' recommended sentence, but rather Brock's request for no prison time that would create an unwarranted disparity.

### F.   The United States' Charging Decisions Are Irrelevant to the Sentencing Analysis.

The defendants have tried to minimize the seriousness of their crimes, suggesting that they should receive sentences even further below the Guidelines ranges than what the United States is recommending because other Cobb County conspirators have not been prosecuted.  Their argument is triply flawed.

*First*, "there is no reason to believe that Congress intended that sentencing disparities between defendants who benefitted from prosecutorial discretion and those who did not could be 'unwarranted.'"  *See United States v. Perez-Pena*, 453 F.3d 236, 244 (4th Cir. 2006) (cited by *United States v. Arevalo-Juarez*, 464 F.3d 1246, 1250 (11th Cir. 2006)).  Indeed, the Eleventh Circuit has held that § 3553(a)(6) does not require a court to treat a convicted defendant similarly to an individual who "was never prosecuted or convicted of any conduct."  *See United States v. Spoerke*, 568 F.3d 1236, 1252 (11th Cir. 2009).

23

*Second*, at its core, the defendants' argument – that their sentences should be reduced because other conspirators have not been prosecuted – asks the Court to evaluate the United States' exercise of its prosecutorial discretion in this case. But as the Supreme Court has recognized, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute . . . generally rests entirely in his discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364 (1978); *see also United States v. Smith*, 231 F.3d 800, 807, 811 (11th Cir. 2000) ("Prosecutors are given broad discretion in deciding against whom to focus limited prosecutorial resources," and courts "are neither authorized nor competent to second guess the government on which among the universe of different crimes should be prosecuted."). There is no question that the United States has probable cause to believe that Brock, Doughty, and Sullivan participated in the charged antitrust and fraud conspiracies; they pleaded guilty.

*Third*, it was entirely appropriate for the United States to focus its prosecutorial efforts on the defendants. Although the fraud loss, volume of commerce, and restitution amounts attributable to some of their co-conspirators are comparable to the amounts attributed to the defendants, Brock, Doughty, and Sullivan stand out because they participated in the conspiracies for so long and affected so many properties and victims. *See* Ex. 18 (summarizing information

24

about Cobb County conspirators).  The defendants admit their participation in the conspiracy from 2007 until 2012, while only four of the other conspirators continued to rig bids in Cobb County after 2009.  Brock, Doughty, and Sullivan also participated in rigging more than 30 properties, but only two of their co-conspirators were involved with more than 10 properties.  One of those two is 79 years old and suffers from a progressive neurodegenerative disorder.  The other withdrew from the conspiracies well before learning of the investigation (unlike Brock, who continued to participate in the conspiracies until he learned of the investigation), cooperated immediately and fully after receiving a grand jury subpoena, and provided substantial evidence implicating several conspirators.  In short, there were sound reasons to focus limited prosecutorial resources on the three most culpable Cobb County conspirators:  Brock, Doughty, and Sullivan.

## IV.   Conclusion

For the foregoing reasons, the United States respectfully requests that the Court sentence Brock to 15 months of imprisonment (followed by a period of supervised release), impose a $75,000 fine, and order him to pay restitution of $91,839.62.[12]

---

[12] The United States reserves the right to provide additional briefing in response to any sentencing memorandum filed by the defendant.

Respectfully submitted this 11th day of October 2016.


   /s/  Andrew J. Ewalt
ANDREW J. EWALT
Pennsylvania Bar # 91356
CARSTEN REICHEL
District of Columbia Bar # 490464
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Room 4120
Washington DC 20001
Tel:  (202) 532-4181
Fax:  (202) 514-7308
andrew.ewalt@usdoj.gov

26

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that, on October 11, 2016, I electronically filed the United States' Memorandum Concerning the Sentencing of Defendant Jeffrey Wayne Brock with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorney of record:

         Donald F. Samuel

                       /s/  Andrew J. Ewalt
                      ANDREW J. EWALT
                      Pennsylvania Bar # 91356
                      U.S. Department of Justice
                      Antitrust Division
                      450 Fifth Street NW, Room 4120
                      Washington DC 20001
                      Tel:  (202) 532-4181
                      Fax:  (202) 514-7308
                      andrew.ewalt@usdoj.gov